```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/27/17

NEW YORK INDEPENDENT
CONTRACTORS ALLICANCE INC. and
LOCAL 175 OF THE UNITED PLANT &
PRODUCTION WORKERS UNION,

              Plaintiffs,

              v.

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC.,

              Defendant.

16 CV 01172 (KMW)

OPINION AND ORDER

KIMBA M. WOOD, District Judge:

      Consolidated Edison Company ("Con Ed") and other New York utility companies purchase excavation and paving services from local construction companies to maintain their underground facilities in New York City. These construction companies, in turn, enter into collective bargaining agreements ("CBAs") with local unions, including those that represent workers who perform asphalt patch-paving work. Plaintiffs[1] are a union and an association of contractors who have CBAs with Plaintiff union. The Complaint alleges that Con Ed entered into anticompetitive agreements with Plaintiff union's rival, Local 1010, and Local 1010's umbrella organization, LIUNA, to help Local 1010 monopolize utility asphalt patch-paving work

---

[1] Plaintiffs are the union whose members have performed most of Con Ed's asphalt patch-paving work for approximately the past ten years, Local 175 of the United Plant & Production Workers Union ("Local 175"), and the alliance of contractors who currently have collective bargaining agreements with Local 175, the New York Independent Contractors Alliance Inc. ("NYICA"). Con Ed's alleged co-conspirators are a rival union, Local 1010 of the Laborers International Union of North America ("Local 1010") and LIUNA itself ("LIUNA"). The Complaint alleges that the beneficiaries of the unlawful agreements are unions affiliated with the Building & Construction Trades Council of Greater New York (the "BCTC"), such as Local 1010.

for Con Ed, in violation of the Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 and 2. Con Ed has moved to dismiss the Complaint. For the reasons stated below, Con Ed's motion is GRANTED.

A. **Background: Con Ed's 2014 Change in its Contracts**

According to the Complaint, in 2014, Con Ed revised its contract terms to require contractors from whom it purchased utility asphalt patch-paving work to employ only workers who belong to a union affiliated with Building & Construction Trades Council of Greater New York ("BCTC"), to the extent such labor is available (the "Provision"). Complaint ¶ 4.[2] Con Ed's reason for the contract revision, as stated to the New York State Public Service Commission, was to avoid "labor disputes between and among labor organizations that could adversely affect the Company." *Id.* ¶ 65. The Complaint alleges that BCTC has denied membership to Local 175, but has accorded membership to Local 1010. Complaint ¶ 31. The Provision thus has the effect of denying Con Ed work to Local 175 members and contractors who are temporarily required by their collective bargaining agreements to employ Local 175 members on Con Ed jobs, unless BCTC-affiliated labor is not available. If Local 175 members seek future work on Con Ed jobs, they might need to leave Local 175 and join either Local 1010, or another union affiliated with BCTC.

Plaintiffs claim that this change resulted, not from Con Ed's concern about labor strife,[3] but rather from an anticompetitive agreement among Con Ed, LIUNA, and Local 1010 to allow

---

[2] The Provision reads:

> With respect to work ordered for Con Edison, unless otherwise agreed to by Con Edison, Contractor shall employ on Work at the construction site only union labor from building trades locals (*affiliated with the Building & Construction Trades Council of Greater New York*) having jurisdiction over the Work to the extent such labor is available.

*Id.*

[3] The Court takes no position on the likelihood of labor strife. The Court takes judicial notice, as it is permitted to do under Federal Rule of Evidence 201, that in 2016, Local 175's Business Manager, Roland Bedwell, was

2

Local 1010 to monopolize Con Ed's asphalt patch-paving work, which Plaintiffs claim would decrease the number of contractors bidding on Con Ed work, could raise Con Ed's costs (by eliminating competition between Local 175 and Local 1010), and could lower the quality of work performed for Con Ed. Plaintiffs' Mem. in Opp. at 5. The Complaint offers no reason Con Ed would enter into such a self-defeating agreement, and counsel for Plaintiffs could offer no reason at oral argument.

Faced with the alleged prospect of losing many members, Local 175 first filed an unfair labor practice complaint with the National Labor Relations Board ("NLRB") Region 29 Office in Brooklyn, in November 2004, claiming that Con Ed, LIUNA, and Local 1010 had agreed to block contractors who used Local 175 workers from bidding for Con Ed work. Region 29 of the NLRB dismissed Local 175's charge, finding that there was no "agreement between Con Ed and Local 1010 regarding the use of subcontractors." Feb. 24, 2015 NLRB Region 29 Decision, *available at* https://www.nlrb.gov/case/29-CE-143863. After Local 175 appealed, the decision was affirmed by the NLRB's General Counsel, who concluded that Con Ed lawfully altered the language in the Agreement concerning the use of subcontractors, and that the evidence did not support Local 175's contention that the change was the result of an agreement between Con Ed and Local 1010.[4] April 27, 2015 NLRB Office of General Counsel's Appeal Decision, *available at* https://www.nlrb.gov/case/29-CE-143863.

Local 175 also filed a complaint with the New York State Public Service Commission, which Local 175 later withdrew. Complaint ¶¶ 63, 65.

---

indicted for conspiring to extort money from the owner of a construction company. Indictment, *United States v. Bedwell*, 16-608 (E.D.N.Y. December 1, 2016).

[4] The Court takes judicial notice of the NLRB's 2015 decision. It only notes the existence of the decision, and does not consider it for its truth.

Local 175 then mounted this antitrust attack. The alleged violation of Section 1 of the Sherman Act, 15 U.S.C. §1, is premised on a purported agreement among Con Ed, LIUNA and Local 1010 to suppress competition among contractors bidding on Con Ed work. Complaint ¶¶ 67-72. The violation of the Sherman Act Section 2, 15 U.S.C. §2, is premised on Con Ed allegedly using its monopoly power over utility asphalt patch-paving work in New York City to weaken Local 175 and to give Local 1010 a monopoly over the utility asphalt patch-paving work in New York City. *Id.* ¶¶ 73-80.

Only for purposes of this opinion, the Court adopts Plaintiffs' definition of the product market (asphalt patch-paving done for utilities, the overwhelming amount of which is allegedly done for Con Ed) and the geographic market (confined to New York City). *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-250 (The court must "draw[] all inferences in Plaintiff's favor."). The Court also will assume the requisite effect on interstate commerce, and that NYICA has standing to pursue at least the claims for injunctive relief. *Id.*

Plaintiffs contend that this alleged agreement harms competition: (1) among contractors, and (2) among unions; specifically, Plaintiffs claim that there will be: (1) a *possible* decrease in the number of contractors competing in the market (Con Ed's conduct "could result in a shortage of contractors . . ."); and (2) loss of competition between Local 175 and Local 1010. Complaint ¶ 59; Plaintiffs' Mem. in Opp. at 5.

**B.     Discussion**

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)

-

("*Twombly*").[5] A complaint alleging an anticompetitive agreement must [state] "plausible grounds to infer an agreement." *Id.* at 556. As the Court held in *Twombly*, the pleading need not require "detailed factual allegations," *id.* at 555, but *Twombly* requires a court to determine whether the Complaint's factual allegations suffice to "raise a right to relief above the speculative level . . . ." *Id.* at 556.

The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, as opposed to facts plausibly suggesting that liability, the pleadings are insufficient. *Id.* at 557. Evaluating whether a complaint alleges a plausible antitrust violation is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Given the high cost and burden that antitrust litigation imposes on parties and the courts, the Supreme Court has directed lower courts to conduct a searching review in addressing motions to dismiss antitrust claims. "[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558 (internal citation omitted). The Court went on to quote language from *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984): "[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the Plaintiffs can construct a claim from the events related in the complaint."

---

[5] In 2009, the Supreme Court reaffirmed the *Twombly* holding in *Ashcroft v. Iqbal*, 556 U.S. 684 (2009).

5

The Second Circuit expanded on this rule in *In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 62-64 (2d Cir. 2012), in which it interpreted the Supreme Court's holding in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). There, the Second Circuit articulated Matsushita's holding as: the more implausible Plaintiffs' allegations of conspiracy, the more persuasive the evidence relied upon must be: that is, where the Plaintiffs' theory of conspiracy is implausible, and the defendants' conduct could as readily be explained as legitimate competitive behavior, a Court must require the Plaintiffs to come forward with more persuasive evidence to support their claim than would otherwise be necessary:

> *Matsushita*, then, stands for the proposition that substantive "antitrust law limits the range of permissible inferences" that may be drawn from ambiguous evidence. It further holds that the range of inferences that may be drawn from such evidence depends on the plausibility of the plaintiff's theory. *See Matsushita*, 475 U.S. at 588; *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Apex Oil Co. v. DiMauro*, 822 F.2d at 246, 253 (2d Cir. 1987). Thus, where a plaintiff's theory of recovery is implausible, it takes "strong direct or circumstantial evidence" to satisfy *Matsushita's* "tends to exclude" standard. *Apex*, 822 F.2d at 253. By contrast, broader inferences are permitted, and the "tends to exclude" standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and "the challenged activities could not reasonably be perceived as procompetitive." (citations omitted).

*Id.* at 63. (quotation marks omitted).

The *Matsushita* court stressed the importance of ascertaining whether an antitrust defendant had a motive to engage in the charged conduct:

> [T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

475 U.S. at 596-97.

The Complaint offers no evidence of an agreement.[6] The Court thus considers whether there are plausible grounds to infer an agreement.

The plausibility of Con Ed entering into an agreement that would raise Con Ed's costs and lower the quality of services it receives is low, to put it mildly. The Complaint contains no explanation for why Con Ed would enter into such an implausible agreement. As in *Twombly*, the defendants' allegedly conspiratorial actions are more likely to have been motivated by a lawful, independent goal, such as a desire to avoid labor unrest at its job sites, rather than by a desire to reduce competition for its business.

Even if such an agreement were plausible, the likelihood of a diminution is competition is highly speculative. Local 175 claims that a contractor's costs will rise if the contractor hires Local 1010 workers, to the extent that the contractor has agreed to pay Local 175 wages and benefits for some period of time, because those contractors would be contractually bound to pay wages and to pay benefits into two unions' funds, rather than one union's fund. Complaint ¶¶ 59, 62. Any such rise in costs, however, would be temporary, lasting only as long as the contractor's agreement with Local 175, and it is speculative whether the contractor's costs would be passed on to Con Ed. Plaintiffs' theory that contractors may go out of business is pure speculation.

Plaintiffs' claim that Con Ed's action will diminish competition among unions, *id.* at ¶ 61, is similarly speculative. Con Ed's Provision leaves contractors free to use the services of any union that is affiliated with BCTC, and free to use unions not affiliated with BCTC when there are not enough workers affiliated with BCTC. Furthermore, nothing prohibits workers

---

[6] The Court rejects Plaintiffs' contention that hearsay comments from individuals who represent Local 175 and one contractor affiliated with Local 175 (Complaint ¶¶ 35-39) evidence an anticompetitive agreement.

from forming one or more new unions that affiliate with BCTC and thus will be able to compete with Local 1010 to perform asphalt patch-paving work on Con Ed projects.

For the reasons stated above, it is highly implausible that Con Ed adopted its Provision to foreclose competition, gain a competitive advantage, or destroy a competitor, the *sine qua non* of a violation of Section 2 of the Sherman Act. For those same reasons, Plaintiffs' Section 1 claim that Con Ed's Provision is an anticompetitive exertion of monopoly power fails the same plausibility test described above.

## CONCLUSION

For the reasons stated above, the Court dismisses the Complaint. Because Plaintiffs have failed to meet the plausibility standard in alleging the existence of an agreement, their Section 1 claims must be dismissed, as well.

SO ORDERED.

Dated: New York, New York
February 27, 2017

*/s/ Kimba M. Wood*
THE HON. KIMBA M. WOOD
United States District Judge